**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

No. 92-7345

---

OUIDA MASSENGILL,

Plaintiff-Counter
Defendant-Appellant,

versus

GUARDIAN MANAGEMENT COMPANY, ET AL.,

Defendants-Counter
Plaintiffs-Appellees.

---

Appeal from the United States District Court
For the Northern District of Mississippi

( April 8, 1994 )

Before REYNALDO G. GARZA, KING and DeMOSS, Circuit Judges.

DeMOSS, Circuit Judge:

This appeal concerns an agreement for the sale of general partnership interests, with each side accusing the other of breach. Both parties were in the business of developing, managing and investing in federally funded low-income apartment complexes, and their attempted transaction was a sale of general partnership interests in a number of such properties. Plaintiff-appellant Ouida Massengill is appealing the magistrate judge's decision to grant damages and specific performance to the defendant-appellee Guardian Management Company ("Guardian") on its counterclaim and to

award Massengill nothing on her suit. We REVERSE and RENDER because we hold that the agreement between Guardian and Massengill is so vague and ambiguous as to be legally unenforceable under Mississippi law.

PROCEDURAL BACKGROUND

Guardian, an Alabama general partnership, filed a complaint in federal court in Alabama on January 19, 1989, seeking a declaration of the rights and obligations of the parties under three documents executed by Guardian and Massengill: (1) the Sales of Interest Agreement; (2) the Amendment; and (3) the Addendum. Massengill, a Mississippi resident, filed a motion to dismiss for lack of personal jurisdiction, which was granted. Several days later, she filed suit against Guardian in federal court in Mississippi, seeking a declaration of rights and obligations under the instruments in question as well as damages for breach of contract. Guardian answered and asserted a counterclaim, claiming that Massengill had breached the contract, asking for damages, and asking the court to require Massengill to sell to Guardian her general partnership interests that were the subject of the Sales of Interest Agreement.

The parties consented to have the case tried before a magistrate judge. See Fed. R. Civ. P. 73. The bench trial was held on March 24 and 25, 1992. At the end of the trial, the magistrate judge dictated an oral bench opinion, ruling in favor of Guardian and ordering Massengill to transfer her general partnership interests in the properties upon Guardian's tender of the agreed

2

per-unit price.[1]   The magistrate judge also awarded Guardian damages of $97,780.80 plus interest for the loss of revenue on management fees as a result of Massengill's refusal to transfer the general partnership interests to Guardian by a particular date for each property as provided in the Sales of Interest Agreement. Massengill appeals from the decision of the magistrate judge. See Fed. R. Civ. P. 73(c).

## FACTUAL BACKGROUND

In 1984 or 1985 the defendant-appellee, Guardian, wanted to expand the number of low income housing projects it managed. Guardian was interested in projects financed by the federal Farmers Home Administration ("FmHA").  Guardian solicited FmHA project owners in Alabama and Mississippi, offering to purchase the general partnership interests in the projects in order to gain management control. Obtaining management control was important because such control carried with it the right to receive federally approved management fees. Massengill, who had developed, managed and invested in FmHA projects for more than a decade, responded to a solicitation letter from Guardian.  At that time, Massengill testified, she wanted to get away from the FmHA business and its numerous federal regulations and concentrate more on regular

---

[1]According to the transcript of the proceedings, the magistrate judge stated: "The court <u>declares</u> that, pursuant to the Sales of Interest Agreement, the plaintiff [Massengill] <u>should transfer</u> her general partnership interest..." (emphasis added).

The written judgment issued on March 26, 1992 provided that "the court <u>declares</u> that plaintiff <u>shall transfer</u> her general partnership interest..." (emphasis added).

The magistrate judge's choice of words is unusual, but we will review this language as a grant of specific performance.

commercial real estate. She thus wanted to sell her interests in more than 20 FmHA projects, which she owned through separate Mississippi limited partnerships with herself as the general partner for each project. (Massengill also owned the majority of the limited partnership interests in each project, but there were other limited partners in many of the projects.)

Massengill negotiated with representatives from Guardian for the sale of her general partnership interests. She argues that her intent was to sell each project only as a complete transaction; she would sell her general partnership interest in a particular project only after, or at the same time as, the limited partnership interests in the same project were also purchased, either by Guardian or by a syndicator.[2] Massengill testified at trial that she felt a responsibility to her limited partner investors; therefore she wanted to syndicate the limited partnership interests first, so her investors could get a good price for their interests. That way, her investors could get out of the project before Massengill was required to transfer her managing interest to a new general partner, who could potentially hurt the investments of the limited partners who had trusted her.

Charles Martin, a partner in Guardian Management, testified at trial that Guardian's objective in the negotiations was to acquire the general partnership interests in all of Massengill's projects;

---

[2]"Syndication," as defined by Guardian in its brief, means that a newly created entity would purchase the limited partnership interests in a group of existing partnerships, with the idea that this newly created entity, the "syndication vehicle," would pay for the purchase by selling interests in itself to investors.

Guardian was not interested in syndicating the limited partnership interests. Martin testified that Guardian would introduce Massengill to a syndicator and assist her in the syndication. Martin said his impression at the beginning was that Massengill wanted to syndicate all of her projects, but his understanding later was that she did not want to syndicate all of the projects "because of tax considerations."

<u>Sales of Interest Agreement</u>

The negotiations between Guardian and Massengill resulted in the execution by both parties of the November 7, 1985 Sales of Interest Agreement. The Agreement provided generally that Massengill would transfer her general partnership interests in the designated projects to Guardian, for an agreed-upon per-unit price, upon the completion of certain conditions listed in the Agreement. One of the conditions that had to occur before Massengill was required to sell her general partnership interests was that Massengill had to enter into a contract with a syndicator "binding the syndicator to syndicate the projects." There was some ambiguity about whether Guardian was obligated to locate the syndicator. The sale of the general partnership interests was also expressly made contingent upon approval of the transaction by the FmHA and by Massengill's limited partners. These approvals were also required by federal law and Mississippi law.

The Sales of Interest Agreement also provided that Guardian would purchase the limited partnership interest in one project, Oakview Apartments, Ltd., for $130,000 in cash. (Massengill owned

100 percent of both the general and limited partnership interests in the Oakview project.)

### Amendment To Sales of Interest Agreement

The second document executed by the parties was titled "Amendment to Sales of Interest Agreement." The three-page document states that Massengill and Guardian desire to amend their agreement, and it goes on to state which numbered paragraphs of the Sales of Interest Agreement shall be deleted and replaced by new paragraphs set out in the Amendment. The Amendment was signed by Massengill on November 25, 1985 and by Charles Martin of Guardian on December 7, 1985. The Amendment deletes Paragraph 1.2 in the Sales of Interest Agreement, which provided that Guardian would purchase the limited partnership interest in Oakview Apartments, Ltd. for $130,000 in cash. The replacement Paragraph 1.2 states that instead, Madison Investment Company would purchase the limited partnership interest in Oakview for a $130,000 secured promissory note, and that Guardian would purchase Madison's note from Massengill for $130,000 in cash, "conditional upon Seller [Massengill] and Madison Investment Company consummating an agreement between Seller and Madison Investment Company on or before December 10, 1985."

The Amendment then concludes: "Except as amended, the original terms of the original Sales of Interest Agreement shall remain in full force and effect."

6

<u>Addendum to Sales of Interest Agreement</u>

The third document executed by Guardian and Massengill was titled "Addendum to Sales of Interest Agreement." The Addendum consists of one paragraph, which states in full:

> "The undersigned hereby state, agree and understand that all conditions of the above referenced contract have been complied with and no conditions are outstanding thereon; the contract is now binding without further conditions to be met."

Massengill testified that she signed the Addendum on December 7, 1985. Martin of Guardian also testified that he signed the Addendum on December 7, 1985. However the Addendum document has three different dates on its face. Immediately under the title, "Addendum to Sales of Interest Agreement," the typed date originally read, "Dated: November 7th, 1985." Thereafter, "7th" was crossed out, and "25th" was hand-written above it. (causing the document's date to be November 25, 1985). But the "25th" is also crossed out, and "7th" is hand-written below the line, followed by the initials "C.A.M." and "O.M." (causing the document's date to be November 7, 1985). Then, down at the bottom of the page near the signature lines, the date "12/7/85" is hand-written (causing the document's date to be December 7, 1985).

Guardian points to these changes to attack Massengill's contention that the Addendum was a totally separate transaction from the Sales of Interest Agreement and the Amendment. The crossouts and interlineations suggest that the parties were attempting to date the Addendum back to the time of the earlier documents. But their attempts did nothing to clarify their

intentions; the Addendum was left ambiguously with two dates that were not crossed out: November 7, 1985, and December 7, 1985.

<u>Circumstances Surrounding Execution of</u>

<u>the Amendment and the Addendum</u>

Guardian introduced Massengill to Thomas S. Ford of Madison Investment Company. ("Madison"). Ford and Madison were to arrange for the syndication of the limited partnership interests. The parties dispute whether Madison was ready and willing to syndicate all of Massengill's projects in December 1985. Guardian claims that Madison was ready to syndicate all of the projects, but that Massengill chose to syndicate only four projects at first, "for tax reasons." Massengill claims that Madison agreed to purchase the limited partnership interests in four of the projects, but she says "Madison had not agreed and never did agree to purchase any of the other projects." At any rate, Massengill, Ford of Madison, and Martin of Guardian met on December 6 and 7, 1985 to review documents and "close" the transaction in which Madison was to purchase Massengill's limited partnership interests in four projects. On December 7, 1985, Martin of Guardian signed the Amendment to Sales of Interest Agreement, which provided that Madison, instead of Guardian, would purchase the Oakview project limited partnership interest by giving Massengill promissory notes, and that Guardian would purchase Madison's notes from Massengill for $130,000 in cash. The reason for these changes in the deal, and

who benefited from the changes, was disputed by the parties. Massengill had already signed the Amendment on November 25, 1985.

Also on December 7, 1985, both Massengill and Martin of Guardian signed the Addendum. Massengill claims that she signed the document "with the understanding and assurance from Guardian that the Addendum only applied to the four projects syndicated on December 7, [1985]." Massengill's position, as stated in an interrogatory answer, was that the Addendum was meant to acknowledge that, as to the four projects, all conditions called for in the Sales of Interest Agreement had been met.[3] Guardian has advanced two somewhat inconsistent explanations of the Addendum's purpose, claiming both that (1) the Addendum acknowledged that all conditions precedent had in fact been met for the transfer of Massengill's general partnership interests, and that (2) Massengill, by signing the Addendum, waived any conditions to be performed by Guardian and thus obligated herself to sell all of her general partnership interests. Guardian also argues that the consideration for the Addendum was the "changes in the deal" addressed in the Amendment. Massengill claims that the four-project deal was concluded and she already had Guardian's check for $130,000 in her hand before she ever saw the Addendum. She claims that an attorney for Guardian brought the Addendum to her at the last minute when everyone was preparing to go home, and explained

---

[3]This argument is confusing in that one condition, syndication, had been met as to the four projects, but another condition, FmHA approval, had not been obtained, and the record does not show whether Massengill's limited partners approved of the transaction.

to her that the document was just "something to have on file" until the instruments on the four-project deal were recorded.

Madison later rescinded its purchase of the limited partnership interests in the four projects and defaulted on its promissory notes. Litigation between Madison and Guardian, and Madison and Massengill, ended in settlement. Guardian did not locate a syndicator for any of Massengill's other projects, and all of them are still owned by Massengill and the other limited partners.

### The Magistrate Judge's Opinion

The magistrate judge dictated a bench opinion into the record on March 25, 1992. After noting the awkwardness a court faces in trying to interpret and enforce complex business contracts, the magistrate judge described the general written provisions of the Agreement, Amendment and Addendum. The magistrate judge then noted that neither Massengill nor Martin is a novice or inexperienced in business contracts, and that Mississippi law forbids a court from writing additional provisions into a contract. The magistrate judge then stated:

> "Absent a mutual mistake, fraud or other illegality, courts do not have the authority to modify, add to or subtract from the terms of a contract validly executed between parties. Moreover, a written instrument must be considered as a whole and all parts construed together. It is also a statement of Mississippi law that contracts are not rendered ambiguous by the mere fact that the parties do not agree upon their proper construction. Finally, as a statement of the applicable law in this case, where contractual language is unambiguous, the contract must be enforced literally." (citations omitted).

The magistrate judge continued:

"Looking at the facts as previously found by the court and applying the law of the state of Mississippi, the court finds that while certain parts of the contract may have been subject to interpretation on what the obligations of Guardian Management Company [were] concerning the obtaining of a syndicator, any ambiguity in that regard was cleared up by the Addendum. The Addendum is clear and unambiguous that all the conditions have been met. That is, an agreement, an addendum to the contract signed by two parties who are familiar with these types of transactions, the court could find no fraud or illegality or mistake of fact, therefore interpreting the document as a whole with the Addendum in place. The court finds that as of the date of the Addendum, December 7, 1985, all conditions of the contract required by Guardian Management Company had been met.

"Accordingly, with that finding, the court declares that pursuant to the Sales of Interest Agreement, the plaintiff should transfer her general partnership interest in the scheduled properties attached to the Agreement upon the tendering by the defendant of the agreed-to price of $281.70 per apartment unit. The other conditions of the contract upon the tender to that still remain in place as far as the approval required and that's left for another day but the interest as it stands now shall be transferred upon the tender of the monies as agreed to."

The magistrate judge then went on to award Guardian damages on the basis that "by not passing the general partnership agreement interest to the defendant there has been a loss of revenue on management fees as clear from the testimony." The magistrate judge ultimately awarded Guardian $73,516.80 for lost management fees resulting from Massengill's refusal to transfer the general partnership interests by a particular date for each property as provided in the Sales of Interest Agreement.

## DISCUSSION

Full appellate review is appropriate in this case, because contract interpretation is a question of law committed to the court rather than a question of fact committed to the fact-finder. Highway Comm'n v. Patterson Enters., 627 So.2d 261, 263 (Miss.

11

1993); <u>Leach v. Tingle</u>, 586 So.2d 799, 801 (Miss. 1991). Therefore, we apply de novo review, which is appropriate to make a "determination as to a contract's facial ambiguity." <u>Reid v. State Farm Mut. Auto. Ins. Co.</u>, 784 F.2d 577, 578 (5th Cir. 1986)(applying Mississippi law). To the extent that the magistrate judge made a finding of fact that all conditions had been met as of December 7, 1985, we hold that such finding is clearly erroneous.

We will not disturb the magistrate judge's decision to apply Mississippi law on general choice-of-law principles and in accordance with the parties' agreement.

Mississippi law favors a determination that the terms of a contract are sufficiently definite, so as to carry out the reasonable intention of the parties. <u>Patterson Enters.</u>, 627 So.2d at 263; <u>Hicks v. Bridges</u>, 580 So.2d 743, 746 (Miss. 1991); <u>Busching v. Griffin</u>, 542 So.2d 860, 863 (Miss. 1989). However, Mississippi courts will refuse to enforce a contract that is "vague, indefinite and ambiguous." <u>Sta-Home Health Agency, Inc. v. Umphers</u>, 562 So.2d 1258, 1260-61 (Miss. 1990)(written non-competition agreement was found to be confusing and "nonsensical" and thus too ambiguous to be enforced); <u>Beck v. Goodwin</u>, 456 So.2d 758, 761 (Miss. 1984); <u>Izard v. Jackson Prod. Credit Corp.</u>, 195 So. 331, 333 (Miss. 1940). Under Mississippi law, "vague, indefinite and uncertain" agreements, in which the promises and performances to be rendered by each party are not reasonably certain, are not enforceable as contracts. <u>First Money, Inc. v. Frisby</u>, 369 So.2d 746, 751 (Miss. 1979); <u>See also</u> <u>Bank of Shaw v. Posey</u>, 573 So.2d 1355, 1358 (Miss.

12

1990)(summary judgment awarded on breach of contract claim because terms "were so vague and uncertain as to be unenforceable").

When a writing does not show the parties' agreement on a minor contract term, the reviewing court may supply a reasonable interpretation. For example, the Mississippi Supreme Court upheld an option contract in Busching, 542 So.2d at 864, because even though the contract failed to specifically fix a time for payment, it did state a purchase price. But essential contract terms may not be supplied by a court. "If any essential term is left unresolved, there is simply no contract and no obligation on the parties." Duke v. Whatley, 580 So.2d 1267, 1274 (Miss. 1991). Guardian and Massengill's attempted agreement is distinguishable from the contract in the Busching case in that the Agreement, the Amendment and the Addendum contain substantial ambiguities on vital contract provisions, rather than merely failing to state the time of performance. The Duke opinion stated:

> "[W]ithout knowledge of the parties' intent of an essential term, this Court, and any court, is unable to determine what performance should be required. The agreement must be definite and certain in order to be enforceable."

Duke, 580 So.2d at 1274 (citing 17 AM. JUR. 2D CONTRACTS § 75 (1964). This Circuit, applying Mississippi contract law, has also recognized that a writing does not constitute an enforceable contract unless "the terms are sufficiently definite to be legally enforced." Knight v. Sharif, 875 F.2d 516, 523 (5th Cir. 1989)

13

(citing <u>Etheridge v. Ramzy</u>, 276 So.2d 451, 454 (Miss. 1973) (writing dealing with the purchase and sale of corporate stock was "too indefinite and uncertain" to be enforceable) ).

Even though Mississippi courts strive to find contracts enforceable, an enforceable contract must contain matter which will enable the court to construe its terms. <u>Mid-Continent Tel. Corp. v. Home Tel. Co.</u>, 319 F. Supp. 1176, 1192 (N.D. Miss. 1970). An agreement is sufficiently definite and specific to be enforceable under Mississippi law if:

> "it contains matter which will enable the court under proper rules of construction to ascertain its terms, including consideration of the general circumstances of the parties and if necessary relevant extrinsic evidence."

<u>E.g., Leach v. Tingle</u>, 586 So.2d 799, 801 (Miss. 1991). If the agreement is not specific enough for the court to ascertain its terms, then the contract is not enforceable. In <u>Beck v. Goodwin</u>, 456 So.2d 758, 760 (Miss. 1984), the court found that the agreement in that case, which purported to assure the continuing availability of automobile financing arrangements, was too vague and indefinite to be enforced. <u>Beck</u>, 456 So.2d at 761. The court noted the uncertainties inherent in the contract, including, among other details, how much money was to be advanced, when the money was to be advanced, and when the advances would be repaid. <u>Id.</u> Because of these uncertainties, the agreement was not enforceable as a contract.

In the case of the Massengill-Guardian agreement, the promises and performances to be rendered by each party are likewise not

14

reasonably certain, and the three executed documents are too contradictory, confusing and vague to constitute an enforceable contract. Even considering testimony on the circumstances surrounding the execution of the three documents, (as well as the magistrate judge's sparse findings of fact on the parties' intentions), we cannot determine the meaning of vital provisions in the parties' attempted agreement. The documents contradict one another on important issues such as Farmer's Home Administration ("FmHA") approval, limited partners' approval and the proper interpretation of the syndication condition. The magistrate judge recognized these deficiencies in the agreement, but stated unhelpfully that the other approvals are to be "left for another day."

The following is a list of reasons why the attempted contract between Guardian and Massengill -- as evidenced in the three documents they executed -- is too confusing, "nonsensical," vague and ambiguous to be legally enforceable:

(1) First, it remains uncertain whether the parties intended to enforce the 1.3 "Conditions" clause in the Sales of Interest Agreement. The Addendum is so vague that it cannot be determined whether the language -- "all conditions of the above referenced contract *have been complied with*" -- extinguishes the original conditions precedent to the sale of Massengill's general partnership interests. The Sales of Interest Agreement and the Addendum are internally inconsistent with regard to conditions. The Sales of Interest Agreement requires three conditions that had

15

to occur prior to the sale of any of Massengill's general partnership interests: (1) a "binding" agreement with a syndicator to syndicate all the properties; (2) the approval of Massengill's limited partners; and (3) FmHA approval of the transfer. Meanwhile, the Addendum provides that all conditions have already been met. Yet, both sides agree, and the evidence shows, that the requisite approvals, both of which are required by law regardless of the agreement, were never obtained. The pretrial order lists as one of the contested issues "whether approval of FmHA and the limited partners is required before any general partnership interests can be transferred to [Guardian]." In addition, Massengill entered into a binding syndication contract for only four of the projects, not for all of them. The Addendum, however, makes no reference to a waiver of those pre-conditions. At trial, counsel for Massengill tried to determine on cross-examination of Guardian's attorney, Gary Olshan, whether Guardian was claiming that (1) the Addendum was a waiver of the syndication condition; or that (2) the Addendum was merely to document that the syndication condition had been satisfied when Guardian introduced Massengill to Ford. Olshan never settled on either theory; his testimony gave both theories at different times. In addition, the other two conditions, FmHA approval and limited partner approval, were glossed over at trial and in the magistrate judge's opinion. The unresolved contradictions and inconsistencies in the documents with regard to these two required approvals render it impossible for any court to determine the existing terms of the contract, namely, whether the

16

approval conditions were waived, or if they are still in effect.

The language in the Addendum is too broad to be given the meaning that the magistrate judge assigned to it. The Addendum stated that all conditions had been met, while the evidence showed that "all conditions," had in fact not been met. The magistrate judge stated that the Addendum was unambiguous and would be enforced literally, but then found that one condition, syndication, had been complied with, while two other conditions, FmHA approval and limited partner approval, had not been met, and would be "left for another day." This is an inconsistent and illogical interpretation.

(2) Also inconsistent is the method in which the instruments were created. The parties submitted drafts of the Sales of Interest Agreement back and forth before a final agreement was executed months later. Likewise, the parties took time to negotiate and draft the Amendment to the Sales of Interest Agreement. Massengill signed the Amendment first and Guardian's representative waited to sign it after having looked it over for a few weeks. The Amendment was detailed and specific. It specified which exact numbered clause of the Agreement was being amended and it detailed the formula by which Massengill was to sell her interests.

The execution of the Addendum was completely different from the method in which the parties had previously executed agreements. According to the testimony of Massengill and her witness, the Addendum was never presented to her for review until the last day

17

of the closing on the four-project deal. The parties disagree on what was said about the Addendum. Guardian contends that the Addendum was part of the same transaction as the Amendment, but if this is true, why didn't the parties include all the terms of the transaction in one document? As discussed above, the Addendum itself is sketchy as to its terms and what it purports to accomplish. It provides that all conditions have been complied with, when in fact they had not. Guardian alleged in its counterclaim that on the day she signed the Addendum, "Massengill waived the occurrence of any further conditions to the Agreement." But as we have stated, the Addendum does not contain waiver language indicating the parties' awareness that the conditions had not been met, but that Massengill intended to waive the conditions and to consider performance under the Sales of Interest Agreement final on Guardian's part. Instead, the Addendum's language speaks in terms of conditions already having been met. Because of these ambiguities and contradictions, we hold that the parties failed to sufficiently evidence what they intended in their execution of the Addendum in relation to the two other instruments.

(3) In addition, the extrinsic evidence considered by the magistrate court indicates that the parties themselves were not certain what obligations were meant to be imposed on each party. A former draft of the Sales of Interest Agreement conditions the sale of the general partnership on Guardian's contracting with a syndicator to syndicate the properties listed on Exhibit A attached to the draft agreement. The Agreement was later changed to make

18

the sale contingent on Massengill contracting with a syndicator to syndicate the properties. In spite of the change in the agreement, both parties appeared to have operated under the assumption that it was Guardian's obligation to find a syndicator, and Guardian continued to search for a syndicator for Massengill both before the four properties were syndicated and after the deal for the syndication for the four properties fell through. Thus, the parties' course of conduct indicates confusion as to the responsibilities of the parties under the agreement. Martin testified that Guardian had a duty to find a syndicator and assist Massengill with the syndicator for the four properties. Thereafter, though, Martin claimed that Guardian was not obligated to find a syndicator, but that it did look for a syndicator for its own protection against Massengill's breach.

The parties were confused about the syndicator issue even before the Addendum was executed. The language regarding syndication in the Sales of Interest Agreement is phrased as a condition and does not mention Guardian: "The purchase price and sale [of the general partnership interests in Massengill's projects] is conditional and contingent upon the Seller [Massengill] contracting with a syndicator binding the syndicator to syndicate the projects ... and upon an agreement being consummated between Seller and Syndicator."

Despite this language, the parties appear to have operated under the assumption that the original Sales of Interest Agreement obligated Guardian to find a syndicator for the limited partnership

19

interests. Adding to the confusion, both parties refer to the syndicator provision interchangeably as a contract promise and a condition. The pretrial order lists as contested issues both whether Guardian was <u>required</u> to produce a syndicator and whether Guardian <u>satisfied all conditions precedent</u> under the Sales of Interest Agreement. Even Guardian's appellate brief to this Court, which echoes Guardian's statement of facts in the pretrial order, describes the agreement as being that Massengill would sell her general partnership interests "<u>in exchange</u> for Guardian's payment of $281 per unit and <u>for Guardian's procuring a syndicator</u> willing to syndicate" the limited partnership interests. (emphasis added).

Massengill, in her original complaint and again in the pretrial order, claims that the Sales of Interest Agreement "was contingent upon several conditions being met by the defendant [Guardian]," and she claims Guardian was in breach for not meeting these conditions. In an interrogatory answer, she states that "[i]t was my understanding that Guardian would be required to syndicate all of my projects prior to having the right to purchase the general partnership interest in any of them." In another interrogatory answer she states that Guardian "has failed to fulfill its obligations pursuant to the Agreement, i.e. failed to syndicate all of my limited partnerships."

Guardian's position, as stated in an interrogatory answer, was that "the Sales of Interest Agreement does not require such prior syndication, and that had any such requirement existed, it would have been eliminated by the Addendum." (This statement again shows

20

Guardian's equivocal position between the two theories of the Addendum's purpose). Martin of Guardian testified at trial that his understanding of Guardian's obligation under the Sales of Interest Agreement was that "we [would] introduce her to a syndicator and that's basically it." Guardian's position in response to an interrogatory was that "bringing a syndicator to Mrs. Massengill satisfied [Guardian's] obligations under the Agreement."

The magistrate judge recognized the ambiguity but ruled that the later-executed Addendum clarified the issue. We hold that this interpretation was conclusory and clearly erroneous.

(4) Also, other ambiguities can be found in the Sales of Interest Agreement itself. The Agreement refers to an Exhibit B which purportedly lists all the security deposits. Yet, no Exhibit B is attached to the Agreement. There is an Exhibit B in the record but it is unrelated; it is a promissory note between Massengill and Madison, and has nothing to with security deposits. Thus, it is not certain what the parties intended by making reference to an Exhibit B in the Sales of Interest Agreement. Further, the terms of the Agreement do not make certain what properties are subject to the transfer of Massengill's general partnership. Exhibit A merely lists the name of the property, the number of units for each and the mortgage amount on each; the contract never provides a more specific or legal real estate description of the location of the properties. Thus, we cannot determine even the city in which each project is located. In addition, some of the project names listed in Exhibit A to the

Sales of Interest Agreement are crossed out by hand, and a hand-written "clarification" signed by Massengill and Martin states that "the projects lined through are a part of Exhibit A." It is not clear what the parties meant by this.

Mississippi law recognizes that in the event circumstances prevent "precise, advance designation of details," less precision is required in drafting a contract. Mid-Continent, 319 F. Supp. at 1197. In this instance, however, no circumstances existed to prevent a specific description. Details such as a property description could have been provided as drafts of the Sales of Interest Agreement went back and forth prior to execution of the document.

In sum, we hold that: (1) It remains uncertain whether any conditions remain to be met before Massengill is obligated to sell her interests, because the three executed documents are internally inconsistent and contradict the testimony at trial; (2) the parties' manner of executing the Addendum was irregular in comparison with the other documents, making it impossible to determine their intent; (3) the parties' testimony and behavior show that they were and still are confused as to the conditions and obligations imposed by the three documents; and (4) there is a missing exhibit, and the descriptions are unclear as to where the properties are located and which properties were meant to be included in the sale.

Therefore, we hold that the attempted contract between Massengill and Guardian is not sufficiently definite and complete

on material points to be legally enforceable under Mississippi law. The magistrate judge's enforcement of the contract by the granting of specific performance and damages was inappropriate.[4]

CONCLUSION

From our de novo review of this facially ambiguous contract, we conclude that the magistrate judge clearly erred in awarding Guardian damages and specific performance. The three documents executed by Massengill and Guardian are so contradictory and ambiguous that the agreement as a whole fails. See Umphers, 562 So.2d at 1260-61. It is legally unenforceable, since its terms cannot be determined by this or any court. See Leach, 586 So.2d at

---

[4]Even if the contract were specific enough to be enforced, we note that Mississippi law requires even greater certainty and specificity to support an award of specific performance. Further, even if a contract is sufficiently clear and definite to make the granting of specific performance possible, the equitable remedy may still be inappropriate. Specific performance will generally not be granted where damages may be recovered and the remedy at law is adequate to compensate the complaining party. Roberts v. Spence, 209 So.2d 623, 626 (Miss. 1968). In this case, the contract is too indefinite to permit any enforcement, much less the specific performance relief given by the magistrate judge. The legal damages granted by the magistrate judge were speculative, since it is not certain when or if the necessary approval by the FmHA and Massengill's partners would have been obtained. Under Mississippi law, a party must prove that he is entitled to damages "to a reasonable certainty." Polk v. Sexton, 613 So.2d 841, 844 (Miss. 1993). Also, monetary damages are not proper unless Massengill breached the contract. As explained in the text, the terms of the agreement are too uncertain for Massengill to have understood her duties under the contract to avoid breach, and too uncertain for a court to determine whether she was in breach or not. In effect, no contract existed, since it is so vague as to be unenforceable. If no contract exists, then there can be no breach, and without breach then there can be no damages. See, e.g., First Money, Inc. v. Frisby, 369 So.2d 746, 751 (Miss. 1979). For all of these reasons, the magistrate court erred by enforcing this agreement with damages and specific performance.

801. The promises and performances to be rendered by each party, as well as the conditions to be met before such performances are due, cannot be determined with reasonable certainty, as is required under Mississippi law. See Beck, 456 So.2d at 758-61. We therefore REVERSE the decision of the magistrate judge enforcing the contract, and RENDER judgment that both Massengill's claims and Guardian's counterclaim are dismissed with prejudice because there is no contract to be interpreted or enforced. See First Money, Inc., 369 So.2d at 751.

REVERSED and RENDERED.