IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 94-60753

_____


HAM MARINE, INC.,

                              Plaintiff-Appellee,

v.

DRESSER INDUSTRIES, INC. and
INGERSOLL-RAND COMPANY, d/b/a
Dresser-Rand Company,

                              Defendants-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Mississippi
_____

Before KING, HIGGINBOTHAM, and PARKER, Circuit Judges.

PER CURIAM:

    Dresser-Rand Company ("Dresser") appeals from a jury verdict awarding Ham Marine, Inc. ("Ham") in excess of $3.7 million for breach of contract and tortious interference with existing or anticipated contracts between Ham and Cliffs Drilling Company ("Cliffs").  We affirm in part, reverse in part, and remand.


## I. BACKGROUND

**A. Facts**

    Dresser, a New York partnership, entered into a contract with Maraven S.A. to compress and reinject natural gas into

Maraven's oil wells at Lake Maricaibo, Venezuela in order to increase oil production.  In April 1991, Cliffs signed on to the project as a subcontractor of Dresser.  Cliffs entered into a series of agreements to charter to Dresser three jackup rigs--Rig 53, Rig 60, and Rig 59--and to initiate the work necessary to convert the rigs to mobile gas pumping units.  Each rig needed to be stripped of drilling equipment, refurbished, and fitted with compressor machinery.  Rig 53 was to be fitted with ten reciprocating compressors; it had to be on-site in Venezuela and pumping by May 8, 1992.  Rigs 60 and 59 were to be fitted with turbine compressors--a new and complex undertaking; they were to be complete and operating by September 26, 1992--six to eight months sooner than usual for a job of this magnitude.  Cliffs was responsible for removal of the drilling equipment, refurbishment of the rigs, and installation of the ten reciprocating compressors.  Dresser was responsible for the manufacture, installation, and hookup of the turbine compressors, and the testing of all three units.

To expedite delivery, Dresser was contemplating dry towing the two turbine rigs together to Lake Maricaibo because it faced substantial monetary penalties if the project was not delivered on time.  Ham's shipyard, located in Pascagoula, Mississippi, is near the only sheltered deep hole in the Gulf of Mexico that can accommodate a ship capable of loading two rigs at one time.  Consequently, in August 1991, Cliffs began negotiations with Ham for partial modification of Rigs 53 and 60.  On September 5,

2

1991, Dresser's Project Director, David Palfreyman, visited Ham's facilities. Ham submitted to Cliffs written lump sum proposals for specific refurbishment work on all three rigs. In a series of phone conversations over the course of the next two months, Palfreyman discussed the work to be performed on all three rigs with various representatives of Ham. On November 11, 1991, Cliffs and Ham executed a contract covering work on Rig 53, and on December 20, 1991, they executed a contract covering Rig 60. Both contracts included clauses allowing for termination by either party at their convenience and specific limitations on consequential damages and prospective profits.[1] Ham submitted contracts containing these terms to Dresser as well, but Dresser never responded. On December 13, 1991, Dresser and Cliffs

---

[1]   Ham's standard terms included the following provisions:

Indemnification.
. . . .
(f)  In no event, except as otherwise provided herein, shall Owner and Contractor, their affiliates or the rig be liable to each other . . . or to any third parties, for any incidental, punitive, consequential, or special damages (including, without limitation, loss of profits and loss of business opportunities), arising out of, resulting from or relating in any way to this Agreement or activities or omissions or delays in connection therewith.

Termination by Owner.
. . . .
(b)  If at any time Owner should consider it necessary or desirable for its convenience to terminate the Work to be performed hereunder, Owner may terminate this Agreement by giving Contractor five day's written notice. . . .  It is specifically understood that Owner shall have such rights even though Contractor shall not in any way have failed to comply with the provisions of this Agreement. . . . Contractor shall not be entitled to any prospective profits or reimbursement of prospective overhead expenses in the event of such termination.

3

executed formal bareboat charter agreements in which Ham was named as Cliffs's designated shipyard for all three rigs. No written contract was executed by Ham and Dresser.

Palfreyman visited the Ham marine yard again on November 25, 1991. Shortly thereafter, by letter, Palfreyman directed Ham to lease warehouse space for storage of materials for all three rigs and he confirmed that Dresser would reimburse Ham for putting in a gas line to test the compressor equipment on all of the rigs. Additionally, Dresser notified Ham that Dresser's suppliers had been directed to ship materials and equipment for all three rigs directly to Ham.

For reasons unrelated to Ham's work on the project, Dresser decided in December 1991, that towing the two turbine rigs together to Lake Maricaibo would no longer be advantageous. Once it was no longer important to work with a shipyard close to the deep hole, Dresser informed Ham that it was seeking competitive bids for the remaining work on Rigs 60 and 59. Ham submitted bids. Dresser paid Ham for the work Ham had done on Rig 53 and Rig 60, and, in January 1992, Dresser awarded the remaining work to Aker-Gulf Marine ("Aker").

## B. Procedural History

On August 5, 1992, contending that Dresser had contracted with Ham for all of the shipyard work on all three rigs, Ham filed suit against Dresser for breach of contract in state court

4

in Jackson County, Mississippi.[2] Additionally, in case it was determined that no legally enforceable contract existed, Ham alternatively claimed tortious interference with existing and prospective contractual relations between Ham and Cliffs. Dresser counterclaimed for allegedly defective work on Rig 53. The action was removed to the United States District Court for the Southern District of Mississippi based on diversity of citizenship. During the eight-day jury trial, numerous writings were introduced that established a nexus between Ham and Dresser and all three rigs. Representatives of Ham testified that Dresser led them to believe that Ham and Dresser had entered into a contract for all the shipyard work needed on all three rigs. At the close of Ham's case in chief, Dresser moved for judgment as a matter of law. With the caveat that it had reservations concerning the tortious interference allegation, the district court denied the motion as to all claims. During the presentation of Dresser's evidence, representatives of Dresser testified that no such agreement was ever made.

The jury found that Dresser had formed a contract with Ham to perform all the repairs to the main decks of Rig 60 and Rig 59, that Dresser breached this contract, and that this breach was the proximate cause of Ham's monetary damages. The jury awarded Ham $3,517,283.94 in damages, based on the net profit that Aker realized for the work that Ham had been authorized to perform

_____

[2] Ham characterized the contract as an oral agreement or, alternatively, as an implied-in-fact contract.

under the contract.  In addition, the jury found Dresser liable for tortious interference with Ham's existing or reasonably anticipated contracts with Cliffs, for which Ham was awarded $200,400.45.  The jury denied Dresser's counterclaim for unsatisfactory work.

Dresser filed posttrial motions, seeking judgment as a matter of law, a new trial, and/or remittitur.  The district court denied the motions, concluding that the jury finding of a contract between Dresser and Ham was not against the great weight of the evidence, that there was sufficient evidence to support a finding of tortious interference, and that the jury award of compensatory damages was not arbitrary.

## II. ANALYSIS

### A. The Contract

The first issue Dresser raises on appeal is whether the evidence adduced at trial was sufficient to support a finding that Dresser had contracted with Ham to perform all the shipyard work on all three rigs.  Dresser contends that there was no contract between Dresser and Ham dealing with Rigs 60 and 59, and that even if such a contract had existed it was too indefinite to be enforceable.

Whether a contract exists involves both questions of fact and questions of law.  The district court's interpretation of a contract is a conclusion of law reviewable de novo on appeal. American Totalisator Co., Inc. v. Fair Grounds Corp., 3 F.3d 810,

6

813 (5th Cir. 1993).  The initial determination of whether the contract is ambiguous is also reviewed de novo.  Thrift v. Hubbard, 44 F.3d 348, 357 (5th Cir. 1995).  However, "once the contract is found to be ambiguous, the determination of the parties' intent through the extrinsic evidence is a question of fact."  Watkins v. Petro-Search, Inc., 689 F.2d 537, 538 (5th Cir. 1982).  A jury's findings of fact are examined on appeal for sufficiency of the evidence.  Granberry v. O'Barr, 866 F.2d 112, 113 (5th Cir. 1988).[3]  The standard of review for a challenge to the sufficiency of the evidence is well-settled.  Unless the evidence is of such quality and weight that reasonable and impartial jurors could not arrive at such a verdict, the findings of the jury must be upheld.  Chemical Distribs., Inc. v. Exxon Corp., 1 F.3d 1478, 1483 (5th Cir. 1993).

---

[3]     Findings of fact that are required to resolve contract ambiguities at a bench trial are reviewed for clear error.  FED. R. CIV. P. 52(a); Chapman & Cole v. ITEL Container Int'l B.V., 865 F.2d 676, 680 n.5 (5th Cir.), cert. denied, 493 U.S. 872 (1989); Carpenters Amended & Restated Health Ben. Fund v. Holleman Constr. Co., Inc., 751 F.2d 763, 766-67 (5th Cir. 1985).  Where a jury verdict is involved, however, the common law standard of review applies because of the requirements of the Seventh Amendment to the United States Constitution.  Granberry v. O'Barr, 866 F.2d 112, 113 (5th Cir. 1988).

"The common law standard of review is not the 'clearly erroneous' standard in a trial before the court as provided in FED. R. CIV. P. 52(a).  Instead it is the same common law standard which is applied in awarding a directed verdict or a judgment notwithstanding the verdict.  The standard of review is usually referred to as a 'sufficiency of the evidence' standard."

Id.

We conduct our review of the jury findings according to Mississippi contract law.  Concededly, admiralty principles govern contracts for vessel repair and conversion.  <u>Todd Shipyards Corp. v. Turbine Serv. Inc.</u>, 674 F.2d 401, 412 (5th Cir.), <u>cert denied</u>, 459 U.S. 1036 (1982).  To the extent that it is not inconsistent with admiralty principles, however, state contract law may be applicable to maritime contracts.  <u>Koninklyke Nederlandsche Stoomboot Maalschappy, N.V. v. Strachan Shipping Co.</u>, 301 F.2d 741, 743 (5th Cir.), <u>cert. denied</u>, 371 U.S. 921 (1962).[4]

In order to find that a contract existed between Ham and Dresser, the jury must determine that both parties agreed to all of the essential terms.  <u>See</u>, <u>Knight v. Sharif</u>, 875 F.2d 516, 525 (5th Cir. 1989) (noting that, under Mississippi law, agreement to contract "must be expressed on all essential terms"); <u>Andrew Jackson Life Ins. Co. v. Williams</u>, 566 So. 2d 1172, 1178 (Miss. 1990) (finding that mutual assent on essential terms was manifested by insured's payment of premiums and completion of insurance application); 1 FARNSWORTH ON CONTRACTS § 3.1 (1990); 1 WILLISTON ON CONTRACTS § 1.3 (1990).  The essential terms on which agreement was required in this case were (1) the scope of the service to be performed, (2) the price, and (3) the date by which the work was to be completed.  <u>See</u>, <u>Leach v. Tingle</u>, 586 So. 2d

---

[4] Both parties concede that the entire dispute is governed by maritime law and that, with regard to every issue raised on appeal, applicable Mississippi law does not conflict with maritime contractual law.

799, 803 (Miss. 1991) (noting that "price is an essential term");
Short v. Columbus Rubber & Gasket Co., 535 So. 2d 61, 64 (Miss.
1988) (stating that the party claiming under an oral employment
contract must prove, at a minimum, the length of the contract and
the amount of salary for the term).  "Agreement" does not mean,
however, that the terms must be set out in the plainest language.
For example, "where, from the terms of the contract, one familiar
with elementary principles of mathematical reasoning may deduce
with certainty the sales price, the contract will not fail."
Leach, 586 So. 2d at 803.

At trial, Ham presented ample evidence from which the jury
could find that there had been mutual assent on all three
essential terms and that, therefore, a contract existed.
Witnesses called by Ham testified that Dresser and Ham agreed
that:[5]  (1) regarding the scope of the work--Ham would complete
all of the shipyard work on all three of the rigs, including
removing the drilling equipment, repositioning the cranes, taking
the legs down, painting the rigs, installing all of the equipment
and interconnecting piping, and testing the compressors; (2)
regarding the price--for certain tasks, Dresser would be billed
lump sum costs, and for the rest, it would be charged time and
material basis rates, "a set dollar amount per man hour for the
utilization of the labor, for any overtime, or for any specialty

---

[5]    Among the witnesses that testified for Ham as to the
scope of the service to be performed, the price, and the
completion date agreed to by Dresser and Ham were Carl Crawford,
William Roy, and William Canfield.

costs;"[6] and (3) regarding the completion date--Ham would complete the work in time for Dresser to timely deliver the rigs to Lake Maricaibo, May 1992 for Rig 53, and September 1992 for Rigs 60 and 59. Moreover, the trial record provides documentary evidence from which the jury could have inferred that Dresser agreed to all of the essential terms of the contract. For example: in its bareboat charter agreements with Cliffs, Dresser acknowledged that Ham had been engaged to complete the marine work on all of the rigs; in correspondence, Dresser indicated that, at its instigation, Ham procured warehouse space and Ham installed gas lines to accommodate all three rigs.

Dresser argues that, if it existed, the contract between Ham and Dresser necessarily included terms allowing termination for convenience and limiting consequential damages--terms included in the standard contract form that Ham sent to Dresser and in the Cliffs-Ham agreements. Dresser argues that Ham never repudiated these terms. Ham responds that the standard contract was sent to Dresser at the request of Palfreyman, Dresser's Project Manager,

---

[6] Crawford testified that, often, due to the rushed nature of the project, Dresser and Cliffs committed work to Ham before all of the engineering details had been worked out. Speaking of Cliffs, he explained the reason for billing on a time and material basis as follows:

[They] had not been able to do a tremendous amount of engineering up front. And without proper engineering, it is almost impossible to price certain items. So we knew that a great deal of the work was going to have to be done on a time and material basis.
. . . .
Probably about 85 percent of that work was done on time and material and 15 percent was done on fixed pricing.

to provide a starting place for negotiations. Both parties presented evidence on this issue. At trial, Palfreyman conceded that he took no action based on Ham's standard contract; he testified that he "put it in [his] drawer and never looked at it again." Clauses introducing unusual terms--such as termination for convenience or limitations on the standard damage remedies available at common law--must be explicitly introduced into a contract by mutual assent of the parties. "[I]n the absence of some provision in the contract authorizing termination or cancellation, every contract is presumed irrevocable." Warwick v Matheney, 603 So. 2d 330, 336 (Miss. 1992). Therefore, we find that there was sufficient evidence for the jury to determine that the termination and damages clauses were not among the terms included in the contract between Dresser and Ham.

Finally, Dresser argues that, even if it existed, whatever terms it contained, the contract alleged by Ham was too indefinite to be enforceable. In order to carry out the reasonable intention of the parties, "Mississippi law favors a determination that the terms of a contract are sufficiently definite." Massengill v. Guardian Management Co., 19 F.3d 196, 201 (5th Cir. 1994). Nonetheless, "Mississippi courts will refuse to enforce a contract that is vague, indefinite, and ambiguous." Id. (quotation marks and citations omitted). Dresser asserts that interpretation of the contract is not a question of fact for the jury but a matter of law, and that therefore, it is reviewable de novo and not subject to the more

11

deferential sufficiency of the evidence standard. By way of support, Dresser cites Massengill, 19 F.3d at 201 (holding that contract was not sufficiently definite on material points to be enforceable under Mississippi law), and Neeley v. Bankers Trust Co., 757 F.2d 621 (5th Cir. 1985).

In so arguing Dresser misconstrues the rule. "The interpretation of a contract is a question of law and the appellate court is not bound by the . . . standard of review [for fact findings] unless ambiguities require the court to consult extrinsic evidence." Tri-State Petroleum Corp. v. Saber Energy, Inc., 845 F.2d 575, 581-82 (5th Cir. 1988) (emphasis added and citation omitted). In Neeley, we pointed out that addressing the issue of indefiniteness "entails both factual and legal determinations, and the intensity of [appellate] review varies accordingly." Neeley, 757 F.2d at 626. Moreover, Massengill and Neeley are distinguishable from the instant case in that both of them involved written agreements manifesting some clear intent to contract. In a case such as the one at bar, where the very existence of a contract is at issue and where interpretation turns on jury consideration of extrinsic evidence, review for sufficiency of the evidence is appropriate. The existence of the contract itself, and what terms it embodied, were questions of fact properly presented to, and determined by, the jury. Consequently, unless there was no credible evidence presented which might authorize the verdict, the jury's findings must stand. Dobson v. Masonite Corp., 359 F.2d 921, 923 (5th Cir.

12

1966).  We conclude that there was ample evidence to support the jury's finding that the terms of the contract were not so indefinite as to be unenforceable.

Once a contract has been found, and its essential terms have been identified and determined to be enforceable, the issue of breach is properly addressed.  This is another question of fact. Chapman & Cole v. ITEL Container Int'l B.V., 865 F.2d 676, 680 (5th Cir.), cert. denied, 493 U.S. 872 (1989).  As with other findings of fact, the jury is in the best position to evaluate the evidence and to assess the credibility of witnesses.  On appellate review, therefore, we defer strongly to the jury's findings.  Id.  The jury concluded that Dresser breached its contract with Ham.  There was sufficient evidence adduced at trial to support this conclusion.


**B. Tortious Interference**

Mississippi has long recognized the tort of interference with the performance of a contract.  See, e.g., Bailey v. Richards, 111 So. 2d 402 (1959).  A person is subject to liability for tortious interference with an existing contract if he "intentionally and improperly interferes with the performance of a contract between another and a third person by inducing or otherwise causing the third person not to perform the contract." Liston v. Home Ins. Co., 659 F. Supp. 276, 280 (S.D. Miss 1986). Ham claimed that Dresser interfered with both existing and prospective contracts between Ham and Cliffs.  To prevail on its

13

claim of tortious interference with a prospective contract, Ham was required to establish that (1) it was reasonably probable that Ham would have entered into a contract with Cliffs, (2) Dresser acted maliciously by intentionally preventing the relationship from occurring, (3) Dresser acted without right or justifiable cause, and (4) actual damage and loss resulted as a result of Dresser's conduct. Cockerham v. Kerr-McGee Chem. Corp., 23 F.3d 101, 105 (5th Cir. 1994).

Like contract interpretation, tortious interference with contract is a mixed question of law and fact. Conclusions of law are reviewed de novo. In contrast, whether the elements of contractual interference have been satisfied is a factual question and the findings of the jury on this issue are reviewed for sufficiency of the evidence. Likewise, the issue of justification is a factual issue to be decided by the jury. Personal Preference Video, Inc. v. Home Box Office, Inc., 986 F.2d 110, 112 (5th Cir. 1993). Dresser asserts the privilege of legal justification as an affirmative defense to Ham's tortious interference claims. Dresser contends that its conduct was justified because it was motivated by a proper business interest rather than a wrongful motive.[7] Because we conclude, on other grounds, that Dresser did not tortiously interfere with any

---

[7] In addition, Dresser maintains that it is not liable for tortious interference because a party cannot be held to have interfered with a contract that is terminable at will. We need not address this argument because it is clear that, in finding that Dresser breached its contract with Ham, the jury found that the contract did not include a termination at will provision.

14

contract between Ham and Cliffs, we need not address the issue of privilege.

Notwithstanding the finding of the jury to the contrary, we conclude that, as a matter of law, Dresser did not tortiously interfere with the contractual relationship between Ham and Cliffs. All of the work that Ham could have performed on the three Maraven project rigs was encompassed within the contract that Dresser was found to have breached. Cliffs, as subcontractor to Dresser, was not in a position to offer Ham any Maraven work not covered by this contract. Furthermore, we can find no evidence in the record that Ham and Cliffs enjoyed any contractual relationship outside the bounds of the Maraven project. Unless Ham and Cliffs had contracted with each other for work unrelated to Dresser's Maraven project, or they were likely to, the contract that Dresser breached covered the same work that would have been covered in any existing or prospective contract between Ham and Cliffs. Ham all but concedes this in its original complaint by proffering tortious interference as an alternative allegation only in the event that its breach of contract claim failed.

Therefore, to the extent that Ham did contract, or would have contracted, with Cliffs for work on the Maraven project, Dresser was a party to the contract. As a matter of elementary legal logic, "a party to a contract cannot be charged with interfering with his own contract." Knight v. Sharif, 875 F.2d 516, 526 (5th Cir. 1989). Only where the person interfering with

15

performance is a stranger to the contract does a party to the contract have a tortious interference cause of action against him.  Cenac v. Murry, 609 So. 2d 1257, 1269 (Miss. 1992).

Moreover, allowing Ham to retain an award of damages for tortious interference would result in a double recovery.  Even though recovery is premised on two different theories, a plaintiff cannot recover the same damages twice.  Atkinson v. Anadarko Bank & Trust Co., 808 F.2d 438, 441 (5th Cir.) (citation omitted), cert. denied, 483 U.S. 1032 (1987).  "Mississippi law is clear that an injured party should not recognize a profit from the damages he has sustained."  Hunnicutt v. Wright, 986 F.2d 119, 124 (5th Cir. 1993) (holding that patient in medical malpractice action should not have been allowed to present evidence of medical expenses which were paid by the Mississippi Dept. of Corrections).  We find that tortious interference with contract is unavailable to Ham as a theory of relief.

**C. Damages**

The jury calculated that Ham suffered damages in the amount of $3,517,283.94 as a result of Dresser's breach of contract.  An assessment of damages is not reversed unless it is clearly erroneous.  Caldarera v. Eastern Airlines, Inc., 705 F.2d 778, 783 (5th Cir. 1983).  Only where it is "so large as to shock the judicial conscience, so gross or inordinately large as to be contrary to right reason, so exaggerated as to indicate bias,

16

passion, prejudice, corruption, or other improper motive" will we reverse a jury verdict for excessiveness. Id. (quotation marks, brackets, and citations omitted). Moreover, review and approval of the verdict by the trial judge tips the scale even more heavily against appellate reconsideration. Haley v. Pan American World Airways, Inc., 746 F.2d 311, 317 (5th Cir. 1984).

Both Ham and Dresser presented damage evidence. Ham based its damage assessment on the total amount that Dresser paid to Aker, arguing that the work performed by Aker was work that would have been performed by Ham under its contract with Dresser. Dresser contests the comparison between Ham and Aker, and also argues that Ham presented no factual evidence from which the jury could accurately calculate reasonable net profits. Dresser contends that, consequently, Ham failed to prove its damages with legal certainty. The right to recover is not precluded by uncertainty regarding the exact amount of damages. Harrison v. Prather, 435 F.2d 1168, 1174-75 (5th Cir. 1970) (citing Koehring Co. v. Hyde Constr. Co., 178 So. 2d 838, 853 (Miss. 1965)), cert. denied, 404 U.S. 829 (1971). The evidence need only lay a foundation upon which the trier of fact can form a fair and reasonable assessment of the amount of Ham's damage. Mutual Life Ins. Co. v. Estate of Wesson, 517 So. 2d 521, 536 (Miss. 1987) (citation omitted), cert. denied, 486 U.S. 1043 (1988). Ham is entitled to no damages on the tortious interference claim because that claim fails as a matter of law. As to Dresser's breach of contract, however, we find that there was sufficient evidence to

allow the jury to make a reasonable determination of Ham's damages, and we conclude that the jury award is not clearly erroneous.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court as to the breach of contract claim and the award of consequential damages, but we REVERSE the judgment of the district court as to the claim of tortious interference with contract, and we REMAND with instructions to amend the judgment so as to delete the award of tortious interference damages. Costs shall be borne by Dresser.