# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

September 9, 2013

No. 11-31202

Lyle W. Cayce
Clerk

Michael F. CONSEDINE, Insurance Commissioner of the Commonwealth of Pennsylvania, in his official capacity as Statutory Liquidator of Reliance Insurance Co.,

Plaintiff – Appellant and Cross-Appellee

v.

PERSONNEL MANAGEMENT, INC.

Defendant – Appellee and Cross-Appellant

Appeals from the United States District Court
for the Western District of Louisiana
USDC No. 06-CV-02277

Before REAVLEY, DENNIS, and CLEMENT, Circuit Judges.

PER CURIAM:[*]

This appeal arises out of an insurance contract dispute between a workers' compensation insurance carrier, Reliance Insurance Co. (Reliance), which is now in liquidation, and the insured employer, Personnel Management, Inc. (PMI). Reliance seeks from PMI $349,140.63 in adjusted premiums and $604,435.00 in deductible losses it claims PMI owes under the policy. Following a bench trial,

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 11-31202

the district court entered a final judgment awarding Reliance partial relief in the form of the adjusted premiums but, after finding that Reliance breached its obligations to follow claims-adjustment procedures, the district court rejected Reliance's claim for the remaining $604,435 in deductible losses. We affirm.

## I.

## A.

The parties' dispute arose out of two workers' compensation policies and related agreements negotiated in the late 1990s, issued by Reliance to PMI. PMI is a Louisiana corporation that operates as an employee-leasing agency. Reliance is an insurance corporation organized and existing under the laws of Pennsylvania. In 1998, PMI sought a workers' compensation insurance carrier. It hired an insurance agent to procure insurance for its workers. The agent in turn solicited an insurance broker to secure the policy, and the broker contacted Union Pacific Insurance Company, which was an affiliate of Reliance Insurance Company (together, "Reliance") at the time.[1] The broker asked Reliance for a quote and in response, Reliance prepared a document called a "Casualty Insurance Program" (or "CIP") Binder, which outlined coverages, premiums, deductibles, aggregate limits, and other financial terms on which the policy would be issued.

PMI decided to retain the services of Reliance for its workers' compensation insurance. Reliance and PMI's agents agreed on pricing terms, and Reliance then issued a separate one-page "Binder of Insurance," which contained the same pricing terms as in the CIP Binder. The policies themselves were issued and delivered to PMI's agents after the terms and conditions were finalized. The first policy covered the period of April 1, 1998 to April 1, 1999.

---

[1] The two affiliates have since merged, leaving Reliance as the sole existing company.

No. 11-31202

The policy was renewed for a second year covering the period of April 1, 1999 to April 1, 2000. The policies' deductible endorsement specified a deductible in the amount of $100,000 per claim, subject to aggregate deductible limits based on PMI's payroll volume.[2]

A functionally identical CIP Binder and Binder of Insurance were issued for the second policy year before the renewed policy was delivered. The annual premium for the first year, based on an estimated payroll of $6,300,000, supplied by PMI during the negotiation of the policy, was $95,120, with a cash collateral of $85,000. The estimated premium for the second policy was $145,160, based on an estimated payroll of $12,063,199, based on information supplied by PMI. PMI paid those estimated premiums and the cash collateral.

There were three principal features of the parties' insurance coverage and claims-handling arrangement: first, the insurance premiums would be adjustable, based on PMI's annual payroll; second, PMI's insurance would be a "high deductible" policy, effectively requiring PMI to self-insure up to $100,000 per claim, with Reliance to pay claims over $100,000; and third, Reliance, through a professional claims administrator, would process, investigate, and pay any claims filed by PMI's employees, and PMI would then reimburse Reliance for any claims within its deductible limit. In effect, the parties had two agreements: first, Reliance would provide insurance coverage based on payroll, and PMI would pay the adjustable premiums; and second, Reliance would administer the claims-handling process for all of PMI's employees, and PMI

---

[2] The deductible endorsement was inadvertently omitted from the first policy, but the parties agree that the policies for both years had a $100,000 deductible and the parties agree to abide by that deductible term.

3

would pay out all claims valued under $100,000, similar to an administrative services only ("ASO") contract.[3]

The adjustable premium agreement was based on the parties' anticipation that PMI's payroll could change drastically over the insurance coverage period, thereby affecting both parties' degree of risk. In fact, during the coverage period between 1998 and 1999, PMI underwent substantial growth. Its payroll expanded from 600 to over 1,000 and it tripled the number of states in which it did business, from three to nine. In anticipation of the company's growth, the parties agreed on a method of adjusting policy premiums dependent on PMI's actual payroll volume in a given year. The policies contained provisions entitling Reliance to audit PMI's payrolls and to adjust the premiums accordingly. Part Five, Section E of both policies provided, in relevant part:

> [T]he final premium will be determined after this policy ends by using the actual, not the estimated, premium basis and the proper classifications and rates that lawfully apply to the business and work covered by this policy. If the final premium is more than the premium you paid to us, you must pay us the balance.

Likewise, Part Five, Section G of the policies stated that "[i]nformation developed by audit will be used to determine final premium." Reliance conducted timely physical audits of PMI's payroll and discovered that the actual payroll was over twice the amount that PMI had estimated (over $14 million rather than $6.3 million in 1998 and $31.4 million rather than $12 million in 1999).

The details of the parties' deductible agreement are also not contained in one single document. The outline of the parties' deductible agreement was set forth in part in the policy itself and in the second policy's deductible

---

[3] *See, e.g.*, Jeffrey D. Mamorsky et al., 2 Employee Benefits Handbook § 46:87 (2013); John J. Munnelly, Administrative Services Contracts, 17 Forum 987, 988-89 (1982).

endorsement. However, the details of the deductible agreement was set forth in documents issued separately from each policy, the "Insurance Program Agreements" (IPAs). At trial, PMI described each IPA as the "'customized' document . . . set[ting] forth the 'guts' of the high deductible policy." The IPAs set forth the method by which the deductibles would be calculated and by which the claims processing would be handled. While the parties did not sign and finalize the IPAs, both parties acknowledge that they intended the IPAs to be enforceable. The district court concluded that the IPA documents did not "constitute part of the policies of insurance," although "PMI received a considerable benefit from the application of the terms contained within the[m]." Nevertheless, the district court concluded that "Reliance always considered that the [IPA] was a part of the Insurance Program, because it contained the provisions, reflected in the binders, establishing aggregate limits. Those limits were of considerable benefit[ ] to PMI, because they limited PMI's maximum exposure for deductible losses. Reliance has always given PMI the benefit of the aggregate limits." Thus, the district court concluded that while the IPAs were not part of the policies themselves, they were intended to be a part of Reliance's "Insurance Program" that governed the handling of PMI's claims and deductible losses, and that the parties' conduct reflected this intention.

At trial, both parties agreed that the policies were intended to be "high deductible policies" whereby PMI would be responsible for the first $100,000 of claims and Reliance would pay the portion of any claim exceeding that dollar value. As consideration for purchasing a large deductible policy, PMI was given a large deductible credit, in the amount of $100,000, which substantially reduced the price of additional premiums. In the first year, the credits brought the premiums down from $304,000 to $95,000, and in the second year, from $492,960 to $235,000.

No. 11-31202

The second policy's deductible endorsement stated that PMI must reimburse Reliance "for the payments we make on your behalf." PMI was required to provide, and did provide, security for its reimbursement obligations, in either cash or letters of credit. The security amount for the first policy was $85,000, and $235,000 for the second. The CIP binders also provided an upper limit to PMI's obligation to reimburse Reliance for the deductibles based on a percentage of payroll, which ultimately amounted to $310,111 for the first policy year and $612,324.00 for the second policy year. At trial, Reliance acknowledged that PMI was entitled to benefit from those aggregate limits though they only appeared in the CIP binders.

In effect, this contractual arrangement provided that PMI would be self-insured for claims up to $100,000, but that Reliance would perform the administrative service of adjusting and paying out all claims on PMI's behalf. For claims that Reliance paid on PMI's behalf that were under the $100,000 deductible limit, PMI would be responsible for reimbursing Reliance. As stated in the IPA, the parties contemplated that PMI would establish an escrow or loss fund account for payment of the deductible losses directly. The IPA states that "[t]he Insured agrees to fund and pay for Paid Losses in accordance with Article III of this Agreement." Article III of the IPA provided, in relevant part, that "[t]he Insured shall establish an account for the payment of Paid Losses[.]" The IPA did not specify which party would fund the escrow account. Although the parties never signed or executed this document, uncontradicted testimony at trial established that the parties' failure to execute the IPA did not affect the policy's pricing or Reliance's obligation to pay losses and, as noted above, both parties acknowledged at trial that they intended to abide by the terms of the IPA.

The parties' principal dispute stems from the claims-administration process employed by Reliance and its third-party claims administrator. The CIP

No. 11-31202

Binders of both policies advertised Reliance's claims-administration "Service Program," which provided a list of Reliance services "applicable to all programs," including "loss control and engineering," "loss exposure analysis," "loss control program evaluation," "training programs," and "claims handling." The CIP binders stated that all claims would be serviced by Sterling, a third-party claims administrator, on behalf of Reliance. However, after the first policy was executed, Reliance hired a different third-party administrator, Crawford & Co., to assist with claims adjustment.

Reliance's claims-handling services were more fully fleshed out in other documents. The IPA incorporated by reference a Claims Service Agreement (CSA) executed between Crawford and Reliance. The CSA set forth a list of thirteen basic services that Crawford was to provide Reliance and PMI in the adjustment of all claims. Those services were:

> To establish a file with respect to each Claim[;] [t]o investigate all Claims and to recommend the amount of loss reserve to be established with respect to each such Claim[;] [t]o provide each Claim file with a written chronology of all actions taken with respect to the underlying Claim[;] [t]o furnish all claim forms necessary for proper claims administration[;] [t]o adjust, settle or resist all Claims within the discretionary settlement authority limit of Service Co. as agreed upon by Service Co. and Insurer, in writing, from time to time (the "Authority Limit")[;] [t]o adjust, settle or resist all Claims in excess of the Authority Limit with the express prior approval of Insurer[;] [t]o supervise all litigation or other proceedings involving any Claim and, where permitted, to attend any judicial or administrative hearing involving any Claim[;] . . . [t]o monitor all treatment programs recommended to a Claimant by any care provider[;] [t]o provide Vocational Rehabilitation and On-site Case Management services for Workers' Compensation claims[;] . . . [t]o provide Hospital Bill Audit Services for Workers' Compensation claims, when warranted, through the vendor approved by Insurer[;] . . . [and] [t]o furnish to Insurer and/or its designees on a monthly basis, a "Loss Run" and a "Loss Fund Activity Report." The term "Loss Run" means a computer generated listing of claims that have

been posted to Service Co.'s Statistical Insurance Support Data ("SISDAT") System[.]

The CSA further required Crawford to transmit all claim payment data to Reliance on monthly data tapes, which were then converted to an electronic format compatible with Reliance's computer system and verified for payment. Crawford was also required to furnish to Reliance and its designees monthly loss run and loss fund activity reports—computer-generated listings of claims or account transactions posted to Crawford's system during the previous month.

For the two policy periods, Reliance, through Crawford, adjusted claims brought by PMI's employees and paid out losses. Reliance introduced evidence that it had paid over $619,000 in claims adjusted under the first policy and over $1,259,000 in claims adjusted under the policy in the second year. PMI produced evidence suggesting that a number of the high-value claims Reliance adjusted were not sufficiently investigated, leading to the payment of implausible or inflated claims. Reliance also introduced evidence that, due to PMI's increased payroll volume, it was entitled to $349,140.63 in adjusted premiums.

During the policy periods in which Reliance provided coverage to PMI, Reliance experienced financial difficulties and ultimately went into liquidation in Pennsylvania in 2001. PMI alleges that, during this period, Reliance failed to provide any of the claims-adjustment services to which they had agreed. PMI asserts that Reliance, contrary to the parties' understanding and agreement, paid for all claims itself without informing PMI of the nature of the claims, the progress of its investigation into the claims, or the number or value of claims that Reliance paid on PMI's behalf. Reliance simply kept its own accounting of the claims and, after several years, requested that PMI reimburse it for all of the claims it had paid on its behalf within PMI's deductible limit. During the first policy year, PMI effectively "pre-paid" the losses with the $85,000 collateral, and Reliance continued to fund the losses once the collateral was exhausted. During

No. 11-31202

the second policy year, Reliance continued to fund the losses itself. PMI asserts that it never received an invoice for the losses, and that it therefore believed that it had so few losses that the $85,000 in collateral it furnished at the beginning of the first policy period had not yet been exhausted by the end of that period. Accordingly, PMI argued at trial that Reliance breached its obligations by failing to furnish PMI with a monthly loss report, by unilaterally altering the third-party administrator from Sterling to Crawford, by unilaterally altering the claims-administration program such that Reliance, rather than PMI, funded all losses instead of billing PMI monthly for the losses, and by failing to set up the system to implement essential communications between PMI and the claims adjusters, Reliance and Crawford.

In 2001, Reliance was placed in liquidation in Pennsylvania. Reliance sent several demand letters, from 2003 to 2005, for payment of the adjusted premiums and $602,435.00[4] in deductible losses, which PMI disputed and refused to pay, among other reasons because of Reliance's failure to provide adequate claims-adjustment services.

**B.**

In 2006, the Pennsylvania Insurance Commissioner[5] filed suit on Reliance's behalf in the Western District of Louisiana seeking reimbursement for the adjusted premiums and deductible losses. PMI, in its defense, argued that no valid contract had been formed, and, in the alternative, argues that

---

[4] It is undisputed that Reliance paid out more in deductible losses than the $602,435 for which it seeks reimbursement, but in the present suit Reliance agrees to honor the aggregate deductible limits set forth in the CIP binder, and therefore seeks only $602,435.00 in deductibles.

[5] Named Plaintiff-Appellant Michael Consedine is the insurance commissioner of Pennsylvania; under state law, he is vested with Reliance's contract rights and can pursue claims on its behalf. One of his predecessors, M. Diane Koken, filed the original complaint on behalf of Reliance. For ease of reference we refer to Reliance as the party in interest.

No. 11-31202

Reliance breached the contract by not following the adjustment procedures outlined in the CIP Binder and the IPA. According to PMI, Reliance's failure to follow the procedures for client communication and the administration and supervision of claims breached the contract and caused PMI unnecessary losses, relieving PMI from having to repay the deductible losses.

After a bench trial, the district court awarded Reliance the adjusted premiums but not the deductible losses.[6] The district court concluded that there was a valid contract that was properly delivered, and awarded Reliance the adjusted premiums in the amounts of $115,909 for the first policy period and $233,784 for the second policy period. However, the district court found that Reliance "breached its obligations under the policy to properly adjust the claims as a result of its failure to communicate"—namely, by unilaterally changing the agreement such that Reliance, rather than PMI, would fund all losses; by unilaterally changing the third-party claims administrator from Sterling to Crawford; by failing to communicate with PMI about the status of claims; and by failing to furnish PMI with monthly loss run reports. Having found Reliance in breach, the district court denied Reliance's claim for deductible losses.

Reliance appeals and requests that we reverse and render judgment in its favor on both of its claims. PMI cross-appeals and argues that there is no valid contract that would entitle Reliance to the adjusted premiums; PMI further argues that Reliance breached its obligations to properly adjust its claims under the policy, and that, accordingly, Reliance is therefore not entitled to any relief.[7]

---

[6] *Koken v. Pers. Mgmt., Inc.*, No. 06-2277, 2011 WL 5855068 (W.D. La. Nov. 21, 2011).

[7] The district court's jurisdiction was based on diversity of citizenship; we have jurisdiction to review the parties' timely appeals from the final judgment entered by the district court. U.S. Const. art. III, § 2, cl. 1; 28 U.S.C. §§ 1291, 1332; Fed. R. App. P. 4(a)(1)(A).

No. 11-31202

## II.

Two issues are before us in this appeal. First, we must decide whether the district court clearly erred in finding that Reliance constructively delivered the insurance policies to PMI as required by Louisiana law. *See* La. Rev. Stat. § 22:873. If not, then the district court correctly awarded Reliance the adjusted premiums. Second, we must decide whether the district court clearly erred in finding that Reliance breached its obligations by failing to communicate with PMI about the status of claims, by failing to furnish PMI with monthly loss run reports, and by unilaterally changing the third-party claims administrator. If not, we consider the related question of whether that breach relieved PMI of repaying the deductible losses Reliance paid through the administrative agreement.

"When a district court's final judgment following a bench trial is appealed, we review the district court's findings of fact for clear error, and conclusions of law and mixed questions of law and fact de novo." *French v. Allstate Indem. Co.*, 637 F.3d 571, 577 (5th Cir. 2011) (citing *Dickerson v. Lexington Ins. Co.*, 556 F.3d 290, 294 (5th Cir. 2009)). "We review the district court's interpretation of contracts and conclusions of law de novo and under the same standards that guided the district court." *Musser Davis Land Co. v. Union Pac. Res.*, 201 F.3d 561, 563 (5th Cir. 2000) (citing *Exxon Corp. v. Crosby-Miss. Res., Ltd.*, 154 F.3d 202, 205 (5th Cir. 1998)). Whether a party breached a contract, and whether a contract term is material, are questions of fact. *E.g.*, *Flint Hills Res. LP v. Jag Energy, Inc.*, 559 F.3d 373, 375 (5th Cir. 2009) (breach); *Allied Elevator, Inc. v. E. Tex. State Bank of Buna*, 965 F.2d 34, 38 (5th Cir. 1992) (materiality).

"Findings of fact . . . must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility." Fed. R. Civ. P. 52(a)(6); *see Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985). "'A finding is clearly erroneous

11

if it is without substantial evidence to support it, the court misinterpreted the effect of the evidence, or this court is convinced that the findings are against the preponderance of credible testimony.'" *French*, 637 F.3d at 577 (quoting *Becker v. Tidewater, Inc.*, 586 F.3d 358, 365 (5th Cir. 2009)). "We will reverse under the clearly erroneous standard 'only if we have a definite and firm conviction that a mistake has been committed.'" *Id.* (quoting *Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 375 (5th Cir. 2000)).

As this action was filed in the United States District Court for the Western District of Louisiana, we are bound to apply the substantive law, including the procedural rules, of the forum state of Louisiana. *See Am. Elec. Power Co. Inc. v. Affiliated FM Ins. Co.*, 556 F.3d 282, 286 n.2 (5th Cir. 2009); *Am. Int'l Specialty Lines Ins. Co. v. Canal Indem. Co.*, 352 F.3d 254, 260 (5th Cir. 2003); *see also Klaxon Co. v. Stentor Elec. Mfg., Co.*, 313 U.S. 487, 496 (1941); *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938). "Under the Louisiana choice-of-law regime, the law of the state where the insurance contract was issued and executed generally governs the interpretation of that contract." *Am. Elec. Power Co.*, 556 F.3d at 286 n.2 (citing *Woodfield v. Bowman*, 193 F.3d 354, 360 (5th Cir. 1999)). It is undisputed that Louisiana substantive contract law governs this suit.[8]

The Louisiana Civil Code defines a contract as "an agreement by two or more parties whereby obligations are created, modified, or extinguished." La. Civ. Code art. 1906. "Interpretation of a contract is the determination of the common intent of the parties." La. Civ. Code art. 2045. In Louisiana, "[a]n insurance policy is an aleatory, nominate contract subject to the general rules of contract interpretation as set forth in [Louisiana's] civil code. The extent of coverage under an insurance contract is dependent on the common intent of the insured and insurer. Thus, when interpreting an insurance contract, courts

---

[8] While the IPA designated New York substantive law as the parties' choice of law, the parties agree that Louisiana substantive law and choice-of-law rules govern.

must attempt to discern the common intent of the insured and insurer. . . . [An] ambiguous . . . provision is construed against the insurer who furnished the contract's text and in favor of the insured." *Succession of Fannaly v. Lafayette Ins. Co.*, 805 So. 2d 1134, 1137 (La. 2002) (citing La. Civ. Code art. 2045; *id.* art. 2056 ("In case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text. A contract executed in a standard form of one party must be interpreted, in case of doubt, in favor of the other party.")) (other citations omitted). Thus, Louisiana insurance policies are construed "to fulfill the reasonable expectations of the parties." William Shelby McKenzie & H. Alton Johnson III, 15 Insurance Law and Practice § 1.4, at 8 & n.10 (4th ed. 2012) (citing, inter alia, *Yount v. Maisano*, 627 So. 2d 148, 152 (La. 1993)).

### A.

First we consider Reliance's delivery of the insurance policies and PMI's obligation to pay the adjusted premiums. By statute, Louisiana requires that all insurance policies be properly delivered to the insureds to become valid and binding. La. Rev. Stat. § 22:873 (requiring that the original policy be "delivered to the insured or a person entitled thereto within a reasonable period of time after its issuance"); *see Pruitt v. Great S. Life Ins. Co.*, 12 So. 2d 261, 262 (La. 1943). "The test of a sufficient delivery is whether the company or its agent intentionally parts with control or dominion of the policy and places it in the control or dominion of [the] insured or some person acting for him with the purpose of thereby making a valid and binding contract of insurance." *Pruitt*, 12 So. 2d at 262 (citation and quotation marks omitted). PMI argues that Reliance did not confect or deliver the policies as required by law.

The district court found that Reliance fulfilled its statutory duty to deliver the policies to PMI. The district court considered the evidence that Reliance

gave the policies to PMI's insurance broker, and that the insurance broker gave the policies to PMI's insurance agent. The agent, in turn, testified that it was his custom and practice to deliver the policies to his clients. The court credited their testimony and found that the policies were delivered. The district court also noted that, under agency law principles, delivery to PMI's insurance agent was sufficient. *See McDermott Int'l, Inc. v. Lloyds Underwriters of London*, 120 F.3d 583, 588 (5th Cir. 1997) ("[D]elivery has occurred if the insurer 'places [the policy] in the control or dominion of . . . some person acting for [the insured].'" (quoting *Pruitt*, 12 So. 2d at 262 (emphasis omitted)). Moreover, the district court reasoned that its finding was supported by the fact that PMI paid Reliance substantial premiums over the course of two years. The district court's finding is not clearly erroneous, and we will not disturb it on appeal.

PMI does not genuinely challenge the district court's finding on this point, but instead argues that Reliance did not deliver both the policies and the IPA, which PMI says vitiates the parties' entire insurance agreement. The district court concluded that the IPAs were not part of the insurance policies themselves, but instead that they documented the parties' agreement by which Reliance would adjust PMI's claims and PMI would be obligated to pay the deductible losses within a certain limit. *Cf.* La. Rev. Stat. § 22:881 ("Every insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy, and as amplified, extended, or modified by any rider, endorsement, or application attached to or made a part of the policy."); *id.* § 22:867(A) ("No agreement in conflict with, modifying, or extending the coverage of any contract of insurance shall be valid unless it is in writing and physically made a part of the policy or other written evidence of insurance, or it is incorporated in the policy or other written evidence of insurance by specific reference to another policy or written evidence of insurance."). We agree with

14

the district court that Reliance carried out its duty under section 22:873 when it delivered the insurance policies to PMI.

## B.

We next review the district court's finding that Reliance breached its obligation to properly adjust claims and the district court's conclusion that, therefore, PMI is excused from reimbursing Reliance for the deductible losses it paid on PMI's behalf pursuant to the claims-adjustment agreement.

As an initial matter, we find no clear error in the district court's finding that Reliance failed to provide the claims-adjustment services it advertised and failed to properly adjust claims and communicate with PMI about the status of its claims. The district court found that Reliance breached its obligations to PMI by failing to adhere to the procedures set out in the CIP binder requiring Reliance to communicate and consult with PMI regarding its adjustment of losses, by unilaterally changing the third-party administrator from Sterling to Crawford, and by unilaterally opting to fund the losses itself rather than billing PMI for the losses on a monthly basis.

These findings were not clearly erroneous. PMI was a professional employment leasing business; as such, PMI alleged that, in the words of the district court, it was "particularly well-suited to assist third party administrators in connection with the adjustment and reduction of exposure for workers' compensation claims, and . . . is able to 'pass through' such costs to its client only when the insurer timely notifies it of such losses and the status thereof." The district court found that Reliance and its agent Crawford did not set up a system by which Crawford could communicate with PMI about its pending claims. Consequently, the district court found, PMI "had no idea how the investigation, mitigation[,] and settlement of any of its claims were progressing[.]" While Crawford did generate loss fund reports, the district court

found that the reports only went to Reliance and not to PMI, because Crawford lacked basic contact information for PMI personnel. Reliance, on its part, also failed to provide the information to PMI as agreed. The district court found that Reliance "fundamentally altered the program" to which the parties had agreed, "so that Reliance funded all losses, instead of a monthly billing of losses submitted to PMI." Accordingly, the district court found, PMI "had no idea how the investigation, mitigation and settlement of any of its claims were progressing . . . [and] PMI had no knowledge of the amount of losses and claims paid until it received its first bill, almost five years later, for $524,070." The district court did not clearly err in finding that these fundamental failures amounted to a breach of contract such that PMI was relieved of reimbursing Reliance for the deductible losses it incurred during the claims process.

Reliance argues that it was under no contractual obligation to perform the services described in the CIP binders and in the CSA into which it entered with Crawford. Reliance argues that the district court erred in concluding that it was obligated to provide those services because they were only set forth in the CIP binder and not in the policies themselves. While Reliance recognizes that those obligations were set forth in the CIP binder, Reliance argues, for the first time on appeal, that the promises and representations it made in the CIP binder were not enforceable because they were not part of the insurance policy. In support, Reliance cites section 22:870 of Louisiana Revised Statutes, which provides that an insurance "'binder' is used to bind insurance temporarily pending the issuance of the policy," and that "[n]o binder shall be valid beyond the issuance of the policy as to which it was given." This argument, however, was not made to the district court. "We will not disturb the district court's judgment based upon an argument presented for the first time on appeal. A party raising an issue on appeal must have raised it before the district court 'to such a degree that the trial court may rule on it.'" *Pluet v. Frasier*, 355 F.3d 381, 385 (5th Cir.

No. 11-31202

2004) (quoting *In re Fairchild Aircraft Corp.*, 6 F.3d 1119, 1128 (5th Cir. 1993), and citing *Vogel v. Veneman*, 276 F.3d 729, 733 (5th Cir. 2002)).

Moreover, the district court relied on Reliance's arguments set forth in its written closing arguments following the bench trial.  At trial, Reliance acknowledged that it had contractual obligations under the policies to furnish loss run reports and to properly adjust the claims, and that PMI would be relieved of its obligation to reimburse Reliance for the deductible losses if Reliance indeed breached its obligations to properly adjust the claims.[9]  In fact, Reliance argued at length that it met its obligations under the policy to properly adjust claims and how it and Crawford upheld their respective obligations under the CSA, which set forth the claims procedures they would follow for PMI's benefit, and which was incorporated by reference by the IPA.

The district court could very well have concluded that the CIP documents were not merely insurance "binders" within the meaning of section 22:870, but rather that section V of the CIPs, along with the IPAs and the CSA, set forth the parties' separate agreement for Reliance to handle the administrative processing of PMI's claims.  The services set forth in the CSA would mean little if Reliance had not agreed, through the representations it made in the CIP binder, that it would provide expert claims-handling services.  But the district court was not called upon to make such an explicit finding because Reliance, in its trial briefing, never raised the point and even acknowledged that if it breached its obligations to properly adjust the claims as PMI alleged, PMI would be relieved of its obligations to repay the deductible losses.  Finding no manifest error in the district court's treatment of the CIP binders, we conclude that Reliance has waived its section 22:870 argument that it raises for the first time on appeal.

---

[9] *See, e.g.*, *Olympic Ins. Co. v. H.D. Harrison, Inc.*, 463 F.2d 1049, 1053 (5th Cir. 1972) ("Louisiana recognizes the principle that where one party substantially breaches a contract the other party to it has a defense and an excuse for non-performance.") (collecting cases); *see also* La. Civ. Code arts. 2013, 2022.

No. 11-31202

Similarly, PMI objects that if Reliance breached its obligations to properly adjust claims, it is relieved of its duty to pay both the adjusted premiums and the deductible losses—not just the deductible losses, as the district court concluded. However, for the reasons just stated, we find no error in the district court's implicit finding that the parties in effect had two agreements: one in which Reliance would provide insurance coverage based on payroll, and PMI would pay the adjustable premiums; and another in which Reliance, through its third-party claims administrator, would administer the claims-handling process for all of PMI's employees, and PMI would pay all claims valued under $100,000.[10] This finding is consistent with the district court's conclusion that the CIP documents detailed Reliance's obligations to furnish the various claims-handling services in its section V, "Service Program," which was separate and distinct from the insurance terms. It is also consistent with the district court's findings that the IPAs were not part of the insurance policies but that they were part of the "insurance program."[11] We therefore consider only whether the district court's finding of breach was clearly erroneous, and, for the reasons stated above, we conclude it was not.

Accordingly, we AFFIRM the judgment of the district court.

---

[10] *Cf. Levy Gardens Partners 2007, L.P. v. Commonwealth Land Title Ins. Co.*, 706 F.3d 622, 631 (5th Cir. 2013) (affirming implied finding of district court following bench trial); *Century Marine Inc. v. United States*, 153 F.3d 225, 230-31 (5th Cir. 1998) (same).

[11] *Ham Marine, Inc. v. Dresser Indus., Inc.*, 72 F.3d 454, 461 (5th Cir. 1995) (existence of a contract is a question of fact); *see generally* McKenzie & Johnson, *supra*, at § 1.4, at 8 & n.10 (Louisiana insurance contracts are construed "to fulfill the reasonable expectations of the parties") (citing, inter alia, *Yount*, 627 So. 2d at 152); *Succession of Fannaly*, 805 So. 2d at 1137; La. Civ. Code art. 1967 ("A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying.").

No. 11-31202

EDITH BROWN CLEMENT, Circuit Judge, dissenting.

The majority preserves the district court's internally inconsistent rulings by inventing a framework the court below did not apply. For the first time, the majority declares the existence of a "claims-adjustment agreement" that it cobbles together from various documents the district court itself held did not "constitute part of the policies of insurance." The majority finds

> no error in the district court's *implicit finding* that the parties in effect had *two agreements*: one in which Reliance would provide insurance coverage based on payroll, and PMI would pay the adjustable premiums; and another in which Reliance, through its third-party claims administrator, would administer the claims-handling process for all of PMI's employees, and PMI would pay all claims valued under $100,000.

Op. 18 (emphases added). Under this approach (using two separate agreements), the majority affirms the district court's (1) award of partial relief to Reliance in the form of adjusted premiums and (2) rejection of Reliance's claim for deductible losses. Such an approach assumes the valid formation of a contract governing claims handling that is without support in the district court opinion or the record. Because neither the district court nor the majority identifies when or how Reliance incurred the contractual obligations it supposedly breached, I respectfully dissent from the denial of Reliance's claim for deductible payments.

I.

The district court found that the policies of insurance constituted binding contracts between PMI and Reliance and awarded Reliance $349,140.63 in additional premium payments. In finding "that the policies of insurance were confected and delivered as required by law," the district court addressed in a footnote various other documents, agreements, and binders that may or may not have formed part of the contract between the parties:

19

> Hartan's files also contain drafts of a separate "Insurance Program Agreement." However, that document was never signed or agreed to by PMI. In fact, Pray, of Hartan, returned the insurance program agreement to Reliance, requesting alterations and updated language, which Reliance admits was never sent. There is a separate document entitled "Personnel Management Casualty Insurance Program Effective: 04/01/98 W.C. Binder NWA 014567-00," prepared by Mike McKeown of Reliance for the 1998 policy and a separate document prepared by Cynthia Artale of Reliance for the 1999 renewal policy, which were both identified by Pray as "binders" of insurance. PMI asserts that the acts of Pray in returning the agreements to Reliance unsigned, for revision, was not "for the purpose of thereby making a valid and binding contract of insurance," but rather, repudiating that draft and requesting another. Reliance contends, and the court agrees, that the Program Agreements do not constitute part of the policies of insurance.

R. 1324 n.8 (internal citations omitted). The district court thus did not consider the IPAs or CIP binders to be part of the insurance policies it enforced against PMI when it ordered the company to pay Reliance the additional premium amounts.

The "implicit finding" of a second agreement governing claims adjustment procedures likely comes from another footnote the district court used to explain why, in its opinion, Reliance's right to reimbursement was subject to the aggregate limits specified in the insurance binders. The district court stated:

> As mentioned earlier, Reliance admits that no insurance program agreement was ever signed by the parties. Reliance instead asserts that the insurance program agreement was never meant to be a part of the policy. Importantly, Reliance always considered that the Program Agreement was a part of the Insurance Program, because it contained the provisions, reflected in the binders, establishing aggregate limits. Those limits were of considerable benefit to PMI, because they limited PMI's maximum exposure for deductible losses. Reliance has always given PMI the benefit of the aggregate limits.

R. 1328 n.12. The findings in the footnote do not show how either an IPA ("Program Agreement") or CIP binder ("Insurance Program") could bind Reliance

with any contractual obligation.  First, "no insurance program agreement was ever signed by the parties," suggesting that there was never mutual consent to be bound or a "meeting of the minds."  Second, even if "Reliance always considered that the Program Agreement was part of the Insurance Program," the Insurance Program never constituted part of the insurance policies themselves.

Additionally, the CIP binders, standing alone, could not have bound the parties with contractual obligations.  Section 22:870 of the Louisiana Revised Statutes provides: "A 'binder' is used to bind insurance temporarily pending the issuance of the policy.  No binder shall be valid beyond the issuance of the policy as to which it was given."  La. Rev. Stat. Ann. § 22:870.  Louisiana appellate courts have held that a "binder is of no effect or import once the policy is issued," *Commercial Union Assurance P.L.C. v. Tidewater Marine Serv., Inc.*, 15 So. 3d 1241, 1244 (La. Ct. App. 2009), and that "[i]t is the policy which controls and the Binder does not constitute part of the policy, nor does it create any rights . . . other than during its effective period." *Liberty Mut. Ins. Co. v. Ads, Inc.*, 357 So. 2d 1360, 1363 (La. Ct. App. 1978) (internal citations omitted).

The CIP binders fall squarely within § 22:870.  As the majority opinion acknowledges, in 1998, PMI's "broker asked Reliance for a quote, and in response, Reliance prepared a document called a 'Casualty Insurance Program' (or 'CIP') Binder, which outlined coverages, premiums, deductibles, aggregate limits, and other financial terms on which the policy *would be issued*," and "[a] functionally identical CIP Binder and Binder of Insurance were issued for the second policy year *before the renewed policy was delivered*." Op. 2 (emphases added).  The CIP binders became invalid upon the respective policies' issuance, and could not create additional rights after that point.

The majority seeks to evade § 22:870 in three ways.  First, it reasons that Reliance makes this argument for the "first time on appeal," and cites as supporting authority cases where parties waived arguments by not making them

No. 11-31202

before the district court.  Second, it claims that "the district court relied on Reliance's arguments set forth in its written closing arguments" where Reliance "acknowledged that it had contractual obligations under the policies to furnish loss run reports and to properly adjust the claims." Finally, the majority finds that "[t]he district court could very well have concluded that the CIP documents were not merely insurance 'binders' within the meaning of section 22:870, but rather that section V of the CIPs, along with the IPAs and the CSA, set forth *the parties' separate agreement* for Reliance to handle the administrative processing of PMI's claims." Op. 17 (emphasis added).

With respect to the majority's waiver point, the district court considered the IPAs and CSA when it determined whether the insurance policies were properly confected and delivered so as to create binding contracts.  In that context, Reliance "contend[ed], and the court agree[d], that the Program Agreements d[id] not constitute part of the policies of insurance." R. 1324 n.8 The record shows that both parties operated under the assumption that the insurance policies themselves–and whatever other documents constituted part of them–were the only relevant contracts for determining the parties' respective obligations.  Reliance had no reason to anticipate that the district court would find that unsigned, extrinsic documents conferred independent contractual obligations.

As to the district court's supposed reliance on the written closing arguments, the majority misconstrues Reliance's position regarding contractual obligations.  Reliance never contested that it had contractual obligations to properly adjust claims.  Its contention is that the contractual obligations for claim adjustment are defined by the policies, and not by the CIP binders or the IPAs.  Reliance's representations to the district court that the majority cites to are consistent with this position.

22

No. 11-31202

Finally, the majority's claim that the district court "could very well have concluded" that the CIP documents constituted a "separate agreement" has no basis in the district court opinion or the record. The district court's opinion never references a "claims-adjustment agreement" or a "separate agreement." In section II.C.2 of its opinion, the district court states that "PMI contends that Reliance was in material breach of its obligations *under the policy* as a result of its failure to communicate with the insured with respect to its claims and losses," and that "[e]vidence of communications *under the policies* between PMI and either Reliance or Crawford was scant, at best." R. 1330 (emphases added). Without explaining how, the district court seems to have equated breaches of the various CIP provisions with a breach of the policies themselves. *See* R. 1336 ("Reliance asserts that there is no provision in the policies that obligated it or Crawford to communicate with PMI or consult with PMI during the adjustment of the losses. However, the Casualty Insurance Program indicates otherwise.").

II.

The district court did not make any specific finding that Reliance (or Crawford) improperly adjusted claims under the policies. Rather, it concluded that "Reliance breached its obligations under the policy to properly adjust the claims as a result of its *failure to communicate*." R. 1340 (emphasis added). The key question thus becomes what contractual obligations to communicate did Reliance owe PMI.

The actions or omissions that the district court identified as breaches violated provisions found only in the "Casualty Insurance Program documents of both policies," and not the policies themselves. Because these documents did

23

not "constitute part of the policies of insurance," there could be no legal breach for Reliance's failure to comply with those provisions.

Reliance did in fact communicate, albeit minimally, with PMI. As the district court's findings of fact note, "Susan Maynor, who was PMI's Human Resource Director during the first policy year, admitted that she received loss runs from Crawford, and identified the loss runs at trial." R. 1321. PMI employees also initiated the claims process for each claim by filing the First Report of Injury forms with Crawford. PMI fails to show how the contracts required anything more. Because detailed communication requirements were not contained in the policies themselves, the district court could not have found breach for failure to communicate.

Nor did Reliance breach a statutory duty of good faith for insurers. "The insurer has an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured or the claimant, or both. Any insurer who breaches these duties shall be liable for any damages sustained as a result of the breach." La. Rev. Stat. Ann. § 22:1973(A). The district court made no finding that Reliance improperly adjusted any claim, and insurers that have paid settlements are "entitled to a presumption of law that [they] exercised reasonableness and good faith in making the settlements." *Ins. Co. of N. Am. v. Binnings Constr. Co.*, 288 So. 2d 359, 362 (La. Ct. App. 1974). The district court cited no evidence from PMI that would rebut this presumption and cannot have based its finding of breach by applying the statutory duty of good faith for insurers.

Finally, although PMI may have had an action in equity or quasi-contract if it proved that it justifiably relied to its detriment on representations Reliance made in the insurance binders, *see* La. Civ. Code Ann. art. 1967, PMI never made such an argument, and the district court opinion did not rely on any equitable theory to justify its conclusions.

24

No. 11-31202

In summary, the district court could not have found that Reliance breached any contractual obligation to PMI regarding claims handling because no contract existed between the two parties other than the insurance policies themselves.  I would reverse the district court with respect to Reliance's deductible payments.  Rather than affirming, this court should at a minimum remand the case so that the district court can define (1) whether any valid contract existed between PMI and Reliance governing claims adjustment, and, if so, (2) the contractual obligations between the two parties.  Only after the district court identifies which terms in which of the numerous "policies," "documents," and "binders" give rise to binding contractual obligations can it determine (3) whether either party breached a contract, and (4) what the proper remedy should be.